King, J.
Mr. Holmes was in the employ of the Pennsylvania Company, who owns a railroad running into this county *398 and having certain tracks and yards. He was employed as a brakeman. He began working for this company in August, 1894, and he worked ujp to the 30th of November, when he was injured. He was employed in the yard, as a switchman, so-called, in coupling and uncoupling cars, and he attended to the yard work generally. This yard is located in the northerly part of the city, on the river bank, and near what is known as the Pennsylvania depot. Mr. Holmes had been in the employ of other railroad companies, and had worked in that capacity for about thirteen years prior to his injury. On the night in question he was directed, by the conductor in charge of a switching train, to run across the yard where they were switching cars, to the west side of it, or — in the language of the switchman, “towards Summit street” — -and swing his lantern to warn the engineer to slack his train or stop, as he had gone far enough. The engineer was not stopping as it was expected he would. From the position that Holmes occupied, the engineer could not see the signal — he would have to go out farther from the train, and the conductor told him to run ¿cross towards Summit street and swing him down. He started to run down in that direction — the direction in which the train was going — and ran along on the track for a few rods, far enough to pass two cars which were there, and then turned, to the left, towards Summit street, and ran off in that direction to give this alarm to the engineer; and, while running, or walking rapidly, he fell into what is known as an “ash-pit.” The ash-pit which is alleged in the petition and shown on the plat, was erected and maintained by the Hocking Yalley Railway Company, which also owned and controlled at least two railroad tracks on that side of the yard; one known as the “dock coal track,” and the other as the “leader,” which ran to a turn table and thus connected with the building in which they stored the engines. The turn-table was perhaps one hundred feet from *399 the ash-pit, and Holmes, as I say, had worked in this yard, three months and a half prior to this injury. On the night in question — -for it was in the night — he had been working .around there and his light had begun to grow dim, and he left his train,and passed across the tracks to a house known-as the “sand-house” — which is situated on the bank,a somewhat steep bank, which rises from that yard up to Summit reet, and at the foot of which rise is the house called the ¡sand-house. He went over into that house to fix his lamp,: and just before he was ordered to give this signal, he had come back from out of the sand-house and passed over the two tracks in question to the track upon which this train was, when the conductor said to him, “Run down there towards Summit street and swing the engineer down;” and he started to do so, and ran down the track in the direction in which, the engineer was going, until he passed these two. cars and then turned to go towards-'the bank. In going to the sand-house to fix his light, and returning as he did, and in going to the sand house and returning at any time, he would pass, necessarily, between the turn-table and the ash-pit, and would leave these objects at about the same distance on either hand. He testifies that he went pretty near tlqe oenter. He testifies further, however, that notwithstanding his experience in the yard,and notwithstanding the fact that he had been over to the sand-house that evening, and on two other occasions to get sand — that he never knew there was an ash-pit at that point until he fell into it and was injured. He testifies that he knew what an ash-pit was; that he had seen them on other roads, and he knew that they were used by railroad companies for the purpose of dropping the ashes from the engines when placed over the ash-pit; that the ash-pit was about the width between the rails of the stack, about three' and one-half feet deep and ■ about the length of a car — which- would make it in the neighborhood of thirty feet long, or more, so that in day *400 light it would be an obstruction to travel, and would be observable by any person who used his senses
He alleges, as one ground of negligence, that these companies did not keep a light out; but he also alleges that it was the property of the Hocking Valley Company, and, I may say here, therefore no obligation rested upon the Pennsylvania Company to keep that lighted, unless that track and that ash-pit were a part of the tracks which they used in the prosecution of their business. There is no evidence in the record before us that they ever did use that track, or that ash-pit, in the prosecution of their business; so that it may be concluded, on this point, that it was not the duty of the Pennsylvania Company to keep it lighted, and it was not the duty of the Hocking Valley Company to keep it lighted for the benefit of the employes of the Pennsylvania Company. On that point I think there can be no question.
In the progress of the trial in the court of common pleas, when the evidence offered by the plaintiff on his own behalf was closed,the court,on motion of both the railroad companies, defendants, instructed the jury to return a verdict for the defendants. Mr. Holmes prosecutes this petition in error to reverse that action of the court of common pleas. The court based its action upon the ground that the evidence did not show that the Pennsylvania Company used this track and ash-pit, or had any control of it; and it did not show that the plaintiff was an employe of the Columbus, Hocking Valley & Toledo Railway Company, and therefore the Columbus, Hocking Valley & Toledo Company owed him no duty which it had violated.
As to the holding of the court upon the question of the Hocking Valley Company’s liability, we think the court based its ruling upon that point upon the correct ground, and we are not disposed to criticize what the court said on either one of the points; and, we are of opinion that the court did not err in its final conclusion of the case, and we *401 think we are aided in this by reference to another part of the record. The plaintiff himself testifies, upon the subject of his injuries, on pages 15, 16, and 17, of the record, as to how he was injured. In the first place, he said he was in a hurry. He did not say he was walking, or running, but he says he was in a hurry:
‘‘Q. Your lantern was lit? A. Yes, sir.
”Q. Your lantern was burning brightly, wasnt’ it? A. I had just fixed it. -
‘‘Q. It was burning brightly? A. It was burning.”
Then he tells about the two cars, and about going over the elevation. It is shown that one of those tracks was elevated about a foot above the other two.
‘‘Q. In going over that elevation, you didn’t trip — your eyes — you were looking straightahead? A. I suppose I was; yes, and I was watching out for the head-light, to give the engineer a signal.
“Q. You were looking straight ahead, in order to keep from stumbling? A. No, I don’t know as I was; the ground looked all alike—
“Q. Did you go over that elevation sidewise? A. No; I went over frontways.
“Q. With your lantern in your hand? A. In my right hand.
”Q. You were looking directly towards Summit street, were you? A. No, sir; I was watching to see, when I got out over the elevation, was watching the head-light, and I suppose I was swinging my right hand, that way.”
And he gives an illustration of how be was swinging it.
”Q. How far is the ash-pit from this elevated road? A. It is only a few feet.”
And then counsel inquire:
‘‘Q. You say you were looking towards Summit street? A. I didn’t say so.
‘‘Q. You were looking towards your engine, were you not? A. I think I was. ”
*402 And finally he says:
“Q. You were looking north tqwards the engine? A. I was trying to get a signal, to get a response to my signal.
“Q. It is not true that you were looking north, to the engineer? A. I think my head was turned that way.
“Q. Your head was turned north to the engineer? A. Yes, sir,
“Q. Then you went down into the ash-pit, without looking where you were going, and with your eyes north, looking towards the engineer? A. I think that is about the way of it.”
Regardless of any theories of how these companies occupied the yard, we think that testimony shows conclusively that the plaintiff himself was careless, and it does not show any excuse for being careless at that point of time.
There is an argument made here that these tracks were used in common by both these companies. It is not clear, from the record, just what use either company did make of those two extra tracks. It is clear, as I have already stated,that those two tracks belonged to the Hocking Valley Company, who maintained them for their use. The Pennsylvania Company did not seem to have had any use of the ash-pit, turn-table and engine-house, but they were used exclusively by the Hocking Valley Company; however, whether the Pennsylvania Company did not sometimes run over those tracks, is not so clear. There might be some doubt whether the Pennsylvania Company did not own some duty to its employes, even when its employes are on those tracks, which were said to belong to the Hocking Valley Company; but it is evident that the plaintiff does not bring his case within the rule that is laid down upon the subject, to authorize him to recover against the Pennsylvania Company for any neglect on his part. This rule has been stated several times. We refer to the 9th Circuit Court Reports, at page 687 and following, and the 49 Ohio St., page, 607, quoting from “Wood’s Law of Master & Servant,” where it is said:
*403 “The servant, in order to recover for defects in the appliances of the business, is called upon to establish three propositions: 1. That the appliance was defective. 2. That the master had notice thereof, or knowledge, or ought to have had. 3. That the servants did not know of the defect, and had not equal means of knowing with the master.”
There is no doubt here, that, if this was a defect, the master had notice of its existence. And there is no doubt, from the plaintiff’s testimony -in the case, that he did not know of its existence; but that does not dispose of the question, as the court says, he must also show that he did not have equal means with the master of knowing of the defect. This ash-pit was not hidden or secret In the first place it may be stated, that it' is doubtful whether it would be any evidence of negligence at all that that ash-pit was maintained there in the yard. It is clear, from knowledge which the court has outside of this case, that ash-pits are things which railroad companies provide at certain places, and it is clear that they usually provide them where engines are put to be housed, or near some point of that sort, so that before they run in the engine to be housed, or repaired, they clean it out and have some place to drop the ashes under the engine. So we think that it was a necessary thing to have; that it could not be housed in, but it had to have an opening at either end of the track for the cars to go through, According to the undisputed testimony in the record, it was certainly large enough to be seen in the day time, at least.
The plaintiff in error was directed to go and give a warning to the engineer to stop. That did not require of him that he should break his neck, or fall into a well-hole, or run against a switch-stand, or against a building — he was bound to go and do that duty as he would perform any other duty and to watch and look and see where he was going. He had a light and the means in his hand to see where he was *404 going — he had a lantern, in good condition and burning properly, and all he had to do was to hold that light where he stepped, so that he could see. He says it was rainy and misty; that it was very dark for a night of that season of the year. So much the more was the duty devolved upon him to use greater care, if he was proposing to run,or hurry; he must go along in the yard the same as he would go anywhere else where his duty called him, and to take these precautions which men of ordinary care and sense take, to protect themselves from danger. There would be no difficulty in seeing this ash-pit (thirty feet long and four and a half feet wide), if he had been looking. But he swears he was looking elsewhere; he says that he was hurrying forward over these tracks — pitching up and down over the elevated track- — -a foot or eighteen inches high — with his eyes fixed upon the engine, two blocks away, which he was following up and swinging his lantern as he was running. The conductor told him to go over to the bank, towards Summit street, and swing his lantern. What he had to do was to go over there carefully, and when he got over there to swing his lantern —that is what he was directed to do, and not to run headlong into something that he did not expect. So we think that upon that ground, for the reason that he was looking at the engine, as he swears, and was not looking^where he was going, that he clearly contributed to his own injury. He testified to that, and there is no dispute as to what he did, and therefore the court very properly took the case from the jury, and the judgment of the court of common pleas will be affirmed.
Scribner, Waite & Wachenheimer, for Plaintiff in Error.
E. W. Tolerton, Esq., for Pennsylvania Company, Defendant in Error.
King & Tracy, for the Columbus, Hocking Valley & Toledo By. Co.